ALEXANDER RICH, Plaintiff, *against* THE NEW YORK ELE-
VATED RAILROAD COMPANY *et al.,* Defendants.

[SPECIAL TERM.]

(Decided April, 1891.)

The theory on which an action to restrain the maintenance and operation of
an elevated railroad above a street may be maintained by an owner of land
abutting on the street, is that the continued operation of the road would
work a substantial injury to such plaintiff and his property, and that an
injunction is necessary to prevent such injury. The primary object of the
action is to obtain the relief by injunction; the recovery of past damages
is a mere incident, allowable only that complete justice may be done, where
plaintiff is entitled to an injunction; and the ascertaining of damage to
the fee by reason of future injury is only a matter of favor to the defend-
ant, in order that the injunction may be avoided on payment of the
amount so found. In such a case, therefore, the first inquiry must always
be whether plaintiff has sustained any injury entitling him to an injunc-
tion.

Where such an action is brought for alleged injuries to several lots owned by
the plaintiff, all on the same street and within a few blocks of each other,
even though they are not contiguous, special benefits peculiar to one of
such lots, arising from the operation of the road, may be offset against
the injury to the others, in determining whether on the whole plaintiff
has sustained or is likely to sustain such injury as would entitle him to an
injunction.

Where, upon such consideration and balancing of advantages and injuries
to various pieces of property by reason of the operation of defendant's
road, it appears that a case of substantial injury requiring equitable inter-
ference by injunction is not made out, but the evidence shows that some
damage may have been done to certain of the properties embraced in the
complaint, and the complaint contains allegations sufficient to entitle
plaintiff to recover for such damages in an action at law, instead of dis-
missing the complaint, the cause may be retained and tried by a jury as an
action at law.

TRIAL of an action at the Equity Term.

The action was brought to restrain defendants from main-
taining and operating their elevated railroad in the street in
front of certain lots owned by plaintiff, and for damages
caused thereby.

*L. Dessar* and *Allen L. Smidt*, for plaintiff.

*Davies, Short & Townsend*, for defendants.

BOOKSTAVER, J.—This is an action in equity to enjoin the maintenance and operation of defendants' railway above the street in front of plaintiff's premises known as Nos. 139, 181, 183, 185, 187 Park Row, and Nos. 20 and 23 Chatham Square, otherwise designated as 233 and 235 Park Row.

The theory on which actions like this are maintained in courts of equity is that the continued operation of defendants' road would work a substantial injury to the plaintiff and his property, and that an injunction is necessary to prevent such injury. The primary object of the action is to obtain this relief by injunction, and not the recovery of past damages, for this is a mere incident to the action, and is allowable only in order that complete justice may be done between the parties, where the plaintiff is entitled to an injunction. Much less is it to ascertain the damage to the fee by reason of future injury to be apprehended, for that is determined, in cases like this, only as a matter of favor to the defendant, and in order that the injunction may be avoided on the payment of the amount so found. (*Lawrence's Case, ante* p. 501).

In cases like the one under consideration, therefore, the first inquiry must always be whether the plaintiff has sustained any injury entitling him to an injunction. In this case, before such inquiry can be made, another question must be determined, and that is, whether or not, in arriving at a conclusion as to the injury, the special benefits peculiar to one piece of property arising from the operation of the road can or should be offset against the injury arising from such operation to other property belonging to the same owner not contiguous to the first, but in the same neighborhood. The *Newman Case* (118 N. Y. 618), announced the doctrine that in determining damages to the easements appurtenant to land abutting on streets through which the elevated roads are maintained and operated, the rule established under the general railroad law must govern awards made under the

rapid transit act, and in estimating damages for the interference with such easements the special and peculiar advantages the abutting property receives from the operation of the railroad and the location of stations must be offset against any injury inflicted. It is true this doctrine was announced in an action at law, but I can see no reason why the rule is not as applicable to suits in equity as to actions at law, and it was so applied by the general term of this court in *Gray's Case* (*ante* p. 510). The latter case also decides that where there are a number of contiguous lots belonging to the same owner specially and peculiarly benefited, the benefit to the whole number must be offset against the injury to all. In the course of the opinion delivered it is said: "Plainly the test is not the number of properties benefited, but the criterion is the relation of the properties to the railroad, and the specific effect of the railroad upon their value." It follows from this that if the various pieces of property mentioned in plaintiff's complaint had been grouped together in one parcel, the benefit to a part must have been set off against the injury to the whole. If the final test is the relation of the properties to the railroad and its effect on the value of all, what does the relation of the various parcels to each other have to do with the question? The road and its operation is the common cause of the special benefit to a part and of injury to the rest. In this case the properties are all on the same street, within a few blocks of each other. The road cannot be operated in front of one unless it is run in front of all the others. The remedy by injunction cannot be granted for the benefit of those injured without at the same time destroying the advantages to those benefited. The plaintiff has the same interest in all. It would therefore seem to be a logical necessity, under the decisions above cited, that the special advantages from the operation of the road, as well as the injuries, should be considered and set against each other, whether the property is contiguous or not, in order to ascertain whether on the whole the plaintiff has sustained, or is likely to sustain, such injury as would entitle him to an injunction. In determining this action it is not

necessary to consider what would have been the result if the lots had been in different neighborhoods, widely separated, nor whether or not the defendant could have set up as a defense the advantages to a lot not set forth in the complaint, as against injuries to those that were, for the plaintiff has chosen to include all in one complaint, and thus to raise this question. It will be time enough to determine the others when they are presented for adjudication.

The inquiry, then, is whether or not the plaintiff has sustained such injury in this case as to entitle him to an injunction. In this consideration lot No. 20 Chatham Square may be left out of the question altogether, as it does not abut on defendants' road, and but little evidence was offered concerning it—none to show it had been injured, and little to show it had received any special advantage. No. 23 Chatham Square was purchased by plaintiff at public auction in 1877 for $12,550, subject to a lease running to May, 1880, at the yearly rent of $1,800 per annum. Before the expiration of this term defendant's road had been built, and was in operation; a station had been constructed on Chatham Square, and the stairs leading to it stand immediately in front of the premises in question. It is one of the most active on the line of the road, where a large number of passengers take the cars, and where exchange of passengers for the different lines is made. About the time this lease expired plaintiff made some repairs at a cost of $4,000, and let the place for $2,800 annually for the period of three years; then he let it for five years from the 1st of May, 1883, for $4,500 per annum; and it also rented for that sum in 1888–1889. In 1889 and 1890 he made two leases for $5,600, or thereabouts. Both tenants, after experimenting with the place, found it unprofitable at that price, and gave up the leases, or were dispossessed. Since then, and probably largely in consequence of the frequent changes, and the time of the year when it was relet, the present rent is only $3,500, the tenant to make all repairs. But I think it clear from the testimony that during all the time since 1883 those premises have averaged $4,500 per annum, and with proper management that sum could have been realized

therefrom. If we assume, however, that the annual rental was worth $4,000 only, then on the basis of 8 per cent., which the experts on both sides say is the fair rental value of property of this kind, the fee of the premises is worth $50,000; and if we take the present rental at $3,600, allowing $100 per annum for repairs, we have a fee value at 8 per cent. of $45,000. But the property cost the plaintiff less than $17,000, including repairs, and this would show a rise in value of $28,000, or more than 160 per cent. on the original cost, due to some cause. What other cause than the operation of the railroad can be assigned for such an enormous increase? In the first place, it may be said with truth that the property was bought at the period of greatest depression following the panic of 1873, although the plaintiff testified, "We had no panic in Chatham Street," and it is true that its effects were less felt in that neighborhood than in many other parts of the town, for the simple reason that it had not been the field of any extraordinary inflation. It is also true that the situation of the premises, commanding, as they do, so many avenues of approach, is exceptionally advantageous, and in consequence they would recover from a depression more rapidly than most properties, and thereafter lead in the rise in value. But allowing for these and all other natural causes tending to increase the value of this property, I do not think that any fair-minded person could say that they had increased the value more than 80 per cent. since 1877; for it must be borne in mind that no large or expensive improvements have been made in this neighborhood for many years. This would leave 80 per cent. of the increase to be attributed to the operation of the railroad, or about $14,000 to the fee value, and more than $1,100 to the annual rental value. This result has been arrived at from plaintiff's own figures, without any reference to the testimony of the experts, which must always be received with some caution. Plaintiff's expert fixes the present value of these premises at $30,000, which is a large increase over their cost; but this figure is not well supported by actual transactions, and would make the rental value 12 per cent., instead of 8 per cent., which he says is the normal relation of

rental to fee value, and there is no adequate cause assigned for this difference.

In arriving at any fair judgment as to the effect of the railroad on the rental and fee value of plaintiff's other property on Park Row, several facts must be considered. The first is that many of the buildings now on that street between Duane and James Streets were erected more than 50 years ago and are but two or three stories high. Plaintiff's buildings, with one exception, are, in the language of his expert, "the old-fashioned kind of cheapest buildings on Chatham Street," which, as another witness says, are in a "very bad state of repair." Besides, no new buildings of any importance have been erected along this street between Duane and James Streets, nor have any extensive improvements been made. Then, too, about the time of the panic, and before there had been any considerable recovery from it, the large carpet, oil cloth, furniture, and other business houses, which up to that time had been in the street, moved out of it to points nearer the new centers established for these respective trades. To all this must be added the fact that for many years that part of Park Row formerly known as Chatham Street had been largely given up to saloons, dance-houses, dives, and other disreputable resorts, and to pawnbrokers and second-hand clothing dealers, usually found in close proximity to such places. When the municipal authorities undertook the regeneration of this district by suppressing these resorts they drove from the owners of the property their most profitable tenants, or at least those who would agree to pay the highest rent, and left on their hands old vacant buildings, dirty and squalid, and not fit for any large or respectable business without considerable outlay of money in altering and rehabilitating them. In order to procure tenants under such circumstances it became necessary for landlords to reduce the rents to such a point as to induce artisans and small traders to move in from other streets. But the evil reputation acquired in former years still clung to the street, and kept honest people from taking up their places of business in it, and it is generally understood that this was the cause which

led the property owners to ask for and the municipal author-
ities to change the name of the street from Chatham, a name
honorable in itself, and having an historical value, to Park
Row, which is a misnomer when applied beyond Chambers
Street. These considerations will make clear the evidence
given in the case as to numbers 139, 181, 183, 185, and 187.

No. 139 Park Row consists of a two and one-half story brick
building on a lot 14 feet wide by about 60 feet deep, and,
according to plaintiff's own testimony, this lot let for $2,200
per annum from 1865 to 1870. In 1876 it rented for $1,800,
and in 1878 it had fallen to $1,400, or a fall altogether of $800
before defendants' road was built. It now lets for $1,100 per
annum; consequently, if this entire depreciation were charged
to the elevated road, it would only amount to $300 per
annum, while plaintiff's expert does not claim the fee value
to have depreciated more than $1,000 or $2,000, and it is safe
to take his lowest figures. This building is in much better
repair than any of the others above named. According to
the same testimony, in 1870 or thereabouts, he let 181 Park
Row for $2,800 per annum. If this is correct, there was a
remarkable falling off in 1871, for from a lease in evidence it
appears this property was let from 1871 to 1874 at $1,600 per
annum, and that was before the panic had set in. There is
now a lease on the premises at the rate of $1,400 per annum,
although plaintiff claims he only collects $1,200 from the
tenant. His expert does not claim that the depreciation in
fee value exceeds $2,000. The building is of brick, three and
one-half stories in height, on a lot 25 feet front by about 46
feet deep. Nos. 183, 185, and 187 are two stories and attic,
peaked-roof brick buildings on a lot 35 feet 6 inches in front
by about 46 feet deep, the ground floor being divided into
three stores, each less than 11 feet wide in the clear. They
are situated at the corner of Roosevelt Street and Park Row,
and are in a very dilapidated and filthy condition. That the
rents have fallen off is not to be wondered at, but that it is
all due to the operation of defendants' road cannot be assumed,
in view of the facts testified to by the plaintiff and his wit-
nesses concerning 139 and 181. If the fee value of 181,

which is 25 feet by 46 feet, with a building on it three and one-half stories high, has only fallen off $2,000 by reason of the operation of defendants' road, as testified to by Mr. Curtis, it is inconceivable that these premises, next door to that, and only 35 feet 6 inches by 46 feet, with buildings only two and one-half stories high, and in bad condition, could have depreciated in value from the same cause $15,000, or even $13,000, as he testifies. This property is only 10½ feet wide,—that is, less than one-half larger than that; and, if the running of the road operated equally on both properties, (and I see no reason why it should not,) then the depreciation from this cause should have been at most only $3,000, instead of $13,-000. The fact that the latter property is on a corner should tend to diminish, rather than increase, the damage, as the side street gives free air, light, and access to the property. But 10 per cent. on $3,000 is only $300, beyond which the rental value should not have depreciated, were the railroad the only cause of the depreciation in value. And I think defendant's testimony in regard to rents on Pearl and Vandewater Streets, where there is no railroad, but which are in the immediate neighborhood, strongly confirms the view. It will be remembered that the stores Nos. 183, 185, and 187 Park Row are only 12 feet wide, and rent for $600 each, without any other part of the building. No. 401 Pearl Street is a building on the corner of Vandewater and Pearl Streets, and is 16½ feet wide, and the entire building rents for $800 a year only; No. 403 Pearl Street is a building 16 feet wide, and the whole building rents for $450 a year; No. 405 is also 16 feet wide, and it, together with 41 Vandewater Street, after having $4,000 spent for repairs, rents for $900 for the whole building, and the buildings 443, 445, 447, and 447½ Pearl Street rent entire for about $460 each; 451, 453, 455, 457, and 459 Pearl Street, just out of Park Row, rent entire for about $600 per year, or for what the stores alone in Nos. 183, 185, and 187 Park Row rent for. The Wemple building, in Pearl Street, shows a falling off of $1,000 per year since 1886 in rent, even after additional attractions costing $10,000 had been added to the store.

So far I have not referred to the testimony of Mr. Fogg, the defendants' expert, not because I do not think him in all respects as reliable as the plaintiff's experts, but because I preferred to examine the case upon the testimony of the plaintiff only. In fact, I think that Mr. Fogg's testimony is better supported by actual transactions than Mr. Curtis' is. It tends to show that, instead of there being any decrease in fee values on Park Row between Duane and James Streets, there has been a considerable advance, and about the same that has taken place in other localities in the neighborhood not upon the line of the elevated road, and that the figures which I have made for the plaintiff have been liberal towards him. It also shows that the owners of property on Park Row have faith in the future of that street, as comparatively few sales have been made on it since the elevated railroad has been in operation.

The sum of the matter then appears to be that the fee value of No. 139 Park Row has depreciated not more than $1,000, of No. 181 not more than $2,000, and of Nos. 183, 185, and 187 not more than $3,000, or $6,000 in the aggregate, against which must be offset the $14,000 peculiar benefit accruing to the premises No. 23 Chatham Square by reason of the operation of defendants' road and the location of the stations; that for the same reason the annual loss in rents has not exceeded $200 for No. 139 Park Row, nor say $300 for 181 and $300 in all for Nos. 183, 185, and 187, or $800 in the aggregate against which must be offset the $1,100 appreciation in rent, which I think is due to special advantages arising from the running of the road. In my judgment, therefore, the plaintiff has failed to sustain the burden he assumed when he tendered the issues in this action, and has failed to show that on all the property as a whole and the whole case he has sustained a substantial injury which would authorize the court to grant an injunction, and it should never be granted merely to coerce an adjustment of differences between the parties.

Under this state of fact, defendants' counsel insists that the complaint should be dismissed, and cites in support of this

contention *Brush* v. *Railway Co.* (13 N. Y. Supp. 908), but in that case the learned judge who tried it found as a fact that the plaintiff therein had sustained no damage whatever, while in this case, I have only found that, upon a consideration and balancing of the advantages and injuries to various pieces of property by reason of the operation of defendants' road, the plaintiff has not made out a case of substantial injury requiring the equitable interference of the court by injunction,—not that the operation of defendants' road has not injured plaintiff in any way or to any amount; on the contrary, I think the evidence shows that some damage has been done to certain of the properties embraced in the complaint. At least the testimony leaves fair room for discussion and difference of opinion upon that subject. And because the plaintiff has mistaken his remedy, I do not think he should be prevented from recovering for the injuries he has actually sustained, especially as the complaint contains sufficient allegations to entitle him to recover for such damages in an action at law. In *Davis* v. *Morris* (36 N. Y. 569), it was said that, should the plaintiff fail to show himself entitled to any equitable relief, but should show a right to legal relief, the judge should not dismiss the complaint, but still order the case to be tried by the jury as an action at law, which I accordingly do in this case upon the payment by the plaintiff to the defendants of the costs and disbursements of this trial, and making his election so to do within 20 days after being required to do so by the defendants or their attorneys, and, if he fails to make such election within said time, then the complaint should be dismissed, with costs.

Order accordingly.